UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
PRITHIBEE STANLEY GHOSE,

Civil Action No.: 22-cv-9397

Plaintiff,

v.

LB&B ASSOCIATES, INC. and
MICHAEL MORALES,

**COMPLAINT**

**PLAINTIFF DEMANDS A
TRIAL BY JURY**

Defendants.
------------------------------------------------------------X

Plaintiff Prithibee Stanley Ghose ("Mr. Ghose" or "Plaintiff"), through his attorneys, Law

Offices of Ian Wallace, PLLC., complains of Defendants LB&B ASSOCIATES, INC. ("LB&B")

and Michael Morales ("Defendant Morales") (collectively "Defendants") as follows:

**PRELIMINARY STATEMENT**

1.      Plaintiff brings this action for racial discrimination, hostile work environment, harassment,

and retaliation for opposing employment practices in violation of 42 U.S. Code § 1981 (a) ("Sec.

1981"), the New York State Human Rights Law, Executive Law § 290, *et seq.* (the "SHRL"); and

the New York City Human Rights Law, New York City Administrative Code § 8-101, *et seq.* (the

"CHRL").

2.      Plaintiff also brings this action for religious discrimination, hostile work environment,

harassment, and retaliation for opposing employment practices in violation of the SHRL and the

CHRL.

3.      Plaintiff seeks injunctive relief and declaratory relief, compensatory and punitive damages,

and other appropriate legal and equitable relief pursuant to the Section 1981, the SHRL and the

CHRL.

## JURISDICTION AND VENUE

4.      All conditions precedent to this lawsuit have been satisfied.

5.      The jurisdiction of this Court is invoked based upon federal question and pursuant to 28 U.S.C § 1331 and 1343.

6.      Venue is proper in the Southern District of New York because the unlawful employment practices were committed by Defendants in the Southern District of New York and because the employment records relevant to this action are located in this district.

## PARTIES

7.      At all relevant times, Plaintiff was employed by LB&B within this district.

8.      Plaintiff is a South Asian man from Bangladesh and is a practicing member of the Gaudiya Vaishnava Hindu religion.

9.      As part of his religious practices, Mr. Ghose wears a long lock of hair on the back of his head, which is called a "śikhā," "choti" or, in West Bengali, "tiki" (hereinafter "śikhā.")

10.     The śikhā signifies in Hinduism and the Vedic religions one's personal devotion and sacrifice to God and it is also an indication of cleanliness.

11.     LB&B is a property management company headquartered in Columbia, MD but operating throughout the United States providing, among other things, facilities management, logistics services and training to various entities.

12.     LB&B is the service contractor providing operations and management services for Defendant GSA at various Federal courthouse buildings throughout New York City, including for the US Court of Appeals for the Second Circuit at the Thurgood Marshall U.S. Courthouse, 40 Centre Street, Room 101, New York, New York 10007 ("the 2nd Circuit Courthouse.")

13.     Defendant Morales was, at all relevant times, the Project Manager at the 2nd Circuit

Courthouse who managed and supervised Plaintiff and was personally responsible for the

discriminatory, harassing, and retaliatory conduct alleged herein against Plaintiff.

## FACTUAL ALLEGATIONS

14.     Defendant Morales hired Mr. Ghose on February 22, 2016 to work for the Fire Safety and

Engineering Department of the 2nd Circuit Courthouse.

15.     Mr. Ghose resigned from his two full time jobs to accept employment with LB&B.

16.     Prior to starting work at the 2nd Circuit Courthouse, Mr. Ghose had to obtain security

clearance and had to submit to extensive mandatory government screening to do so.

17.     Defendant Morales was Plaintiff's direct manager who assigned him his work.

18.     Mr. Ghose's job title was Fire Safety Director and in that role he was responsible for

implementing and overseeing the fire and safety policies and procedures at the 2nd Circuit

courthouse.

19.     Mr. Ghose was also responsible for conducting safety trainings and presentations for the

staff of the 2nd Circuit, creating evacuation plans, coordinating with court security, inspecting

the elevators, ensuring that the Courthouse's sprinklers and other fire prevention systems were

working properly and responding to emergencies.

20.     Plaintiff's work performance was good throughout his tenure as reflected in his annual

performance appraisals compiled by Defendant Morales.

21.     In his work performance appraisals, Defendant Morales inserted comments such as "You

[sic] doing very good job Stanley, thank you."

22.     Plaintiff's managers and supervisors, including Defendant Morales, complemented him

often on his work and Mr. Ghose's relationships were good with his managers and co-workers.

23.     Until April 17, 2018, Mr. Ghose conducted approximately 35-40 training seminars on fire safety by himself and over a hundred seminars with David Anderson without issue and to largely suitably satisfied participants.

24.     After the seminars, the participants were routinely asked to leave their comments about the training and how it was conducted and those regarding Mr. Ghose were suitably positive.

25.     Plaintiff's work environment and his relationships with Defendants changed drastically for the worse when he protested the racial harassment Ms. O'Hagan Wolfe had subjected him to.

26.     Once Plaintiff complained of racial harassment, Defendants, and particularly, Defendant Morales, started to retaliate against Mr. Ghose and subject him to further racial harassment and discrimination.

27.     At all relevant times, Mr. Ghose was the only South Asian/Bangladeshi individual who worked for LB&B at the 2nd Circuit Courthouse.

28.     Defendants also harassed Plaintiff based on his religion.

**Ms. O'Hagan Wolfe Racially Harasses Mr. Ghose**

29.     On or about April 17, 2018, Mr. Ghose was assigned to perform a fire safety seminar and fire warden training course on the 17th Floor of the 2d Circuit Courthouse to the court staff and employees.

30.     In attendance at this seminar was Ms. O'Hagan Wolfe along with approximately twenty other members of court staff.

31.     Just prior to the start of the seminar, Ms. O'Hagan Wolfe was visibly annoyed and hostile toward Mr. Ghose and told him, "We were just trained not too long ago. Why did you come here to do a training again? Do it quickly and go!"

4

32.     Plaintiff replied that he was required to administer fire safety training twice a year and that it was not his decision.

33.     Then soon into the seminar, Mr. Ghose turned around and upon seeing his śikhā at the back of his head, which was clearly visible, Ms. O'Hagan Wolfe exclaimed, "Look at him! His ponytail! He is embarrassing. I don't know who hired him."

34.     Ms. O'Hagan Wolfe stated this loudly in front of all those present and was visibly irritated and angry when she spoke.

35.     Mr. Ghose heard this comment as did all those present at the seminar, most of whom were also visibly taken aback and uncomfortable.

36.     Mr. Ghose felt humiliated and belittled by Ms. O'Hagan Wolfe's comments.

37.     Someone in attendance, who appeared to be sympathetic towards Mr. Ghose, told him, "Don't worry. Just do your thing and go."

38.     During the training, Ms. O'Hagan Wolfe also asked Plaintiff about the "Shelter in Place" ("SIP") protocol, which are the courthouse procedures in place when there is severe weather, fire, an intruder or some civil disturbance, or other incidents that can cause building damage.

39.     Mr. Ghose explained the basic SIP protocol, including in the event court staff are required to be sequestered in the building for up to three days.

40.     During the rest of the training session, Ms. O'Hagan Wolfe continued to be dismissive and patronizing towards Mr. Ghose.

41.     For example, Ms. O'Hagan Wolfe asked Mr. Ghose who had instructed him to do the training and she asked him repeatedly, in a sarcastic tone, "What did you say?"

42.     Ms. O'Hagan Wolfe did this to belittle Mr. Ghose. Mr. Ghose speaks English fluently but with a strong Bengali accent.

43.     Despite Ms. O'Hagan Wolfe's disruptive behavior, Mr. Ghose completed the seminar and all those who attended signed an attendance sheet, including Ms. O'Hagan Wolfe.

44.     After the training session, Plaintiff went down to the Fire Command Station located adjacent to the lobby of the 2nd Circuit Courthouse where he was relieved by Mr. Ghose's direct supervisor, LB&B's Chief Engineer, Otis Vaughan.

45.     Mr. Ghose complained to Mr. Vaughan about Ms. O'Hagan Wolfe's racially harassing comments.

46.     Mr. Ghose told Mr. Vaughan the comments were obviously racist, not least because Ms. O'Hagan Wolfe had referred disparagingly to his śikhā.

47.     After reviewing the attendance sheet of those who attended the seminar, Mr. Vaughan confirmed it was Ms. O'Hagan Wolfe who had made the offensive comments to him, telling Mr. Ghose she was the "number 3 in the building," i.e., the third person in command at the courthouse.

48.     Mr. Vaughan added that Ms. O'Hagan Wolfe was one of the Building Operations team members.

49.     Mr. Vaughan then said to Mr. Ghose, "Oh man!" and left the room.

50.     A few minutes later, Mr. Vaughan and Defendant Morales both approached Mr. Ghose, who had remained in the Fire Command Center.

51.     Defendant Morales told Mr. Ghose he had just called Ms. O'Hagan Wolfe and she had told him Mr. Ghose had mentioned the "shelter in place" ("SIP") procedures during his presentation.

52.     Mr. Ghose responded that he did mention the "SIP" procedures during the training.

53.     Defendant Morales asked Plaintiff why he had mentioned those procedures and Mr. Ghose replied that the SIP procedures were part of his training manual and he showed Defendant Morales the pages containing those procedures in a manual that was in the office.

54.     With a pen Defendant Morales crossed out the SIP procedures in the manual and told Plaintiff he was not to train persons on those SIP procedures.

55.     This was the first time Defendant Morales had instructed Plaintiff not to instruct staff on the SIP procedures.

56.     From then on, however, Mr. Ghose did as Defendant Morales instructed and removed the SIP procedures from his training curriculum.

57.     At this time, or shortly thereafter, Mr. Ghose complained to Defendant Morales about Ms. O'Hagan Wolfe's offensive comments and how she had ridiculed his śikhā and appearance and that her comments were racist.

58.     Defendant Morales instructed Mr. Ghose not call the corporate office directly about any work- related issues, including about Mr. O'Hagan Wolfe's racist comments.

59.     Rather, Defendant Morales told Mr. Ghose to raise any work-related issues with him directly, or with Mr. Vaughan or LaWanda Lawrence, LB&B's Administrative Secretary and Defendant Morales' Administrative Assistant.

60.     On or about April 19, 2018, Defendant Morales called Mr. Ghose to attend a weekly meeting held every Thursday for managers and supervisors – including Ms. O'Hagan Wolfe - to devise the training plans for the upcoming week.

61.     This was the first time Mr. Ghose had been told to attend such a meeting during his employment and Defendant Morales did not explain to him why he was being asked to attend.

62.     After entering the room, Mr. Ghose saw about ten people at the meeting, including Defendant Morales and Ms. O'Hagan Wolfe.

63.     After Mr. Ghose entered, the person directly adjacent to Mr. Ghose asked him where he was from, to which Mr. Ghose replied, "I'm from Bangladesh."

64.     This same person then told Mr. Ghose to turn around, and he did.

65.     Mr. Ghose's śikhā would have been visible to all those present.

66.     After Mr. Ghose turned around, Defendant Morales dismissed Plaintiff from the meeting saying, "It's OK Stanley you can go back to work now" whereupon Mr. Ghose left the room.

67.     Mr. Ghose felt humiliated and belittled at what had transpired.

68.     Around two hours after attending this meeting, Defendant Morales and Mr. Vaughan told Mr. Ghose he was prohibited from conducting trainings for court personnel located on the 17th and 18th floors, where Ms. O'Hagan Wolfe worked.

69.     They also told Plaintiff to avoid the 16th, 17th, and 18th floors altogether and to only go to those floors if there was an emergency.

70.     Defendant Morales also told Plaintiff, "Don't let Catherine [O'Hagan Wolfe] see you in the building. She doesn't like you."

71.     They also reminded Plaintiff that Ms. O'Hagan Wolfe was the "third person in rank" in the 2nd Circuit Courthouse.

72.     Thereafter, Mr. Ghose avoided the 16th, 17th, and 18th Floors altogether.

73.     Around this time, Plaintiff told Defendant Morales he wanted to complain to LB&B's corporate head office about Ms. O'Hagan Wolfe's offensive and racist statements to him at the training seminar.

74.     In response, Defendant Morales threatened to "fire" Mr. Ghose if he reported Ms. O'Hagan Wolfe's offensive statements to the head office or anyone within LB&B's HR Department.

75.     LaWanda Lawrence was present and overheard this threat to Mr. Ghose's employment.

76.     As a result, Mr. Ghose was deterred from lodging a complaint with LB&B's Corporate Office.

### Defendants' Retaliation & Harassment

77.     After Plaintiff protested Ms. O'Hagan Wolfe's racial harassment to Defendant Morales, Defendants started to retaliate against Mr. Ghose.

78.     As stated below, Defendant Morales' unlawful retaliatory action culminated in him discharging Mr. Ghose without justification and for false reasons in March 2019.

79.     Defendant Morales began to intensely scrutinize and unfairly criticize Plaintiff and to treat him differently compared to his similarly situated, non-South Asian/non-Bangladeshi/non-Hindu co-workers.

80.     Defendant Morales began to use threatening language towards Plaintiff such as "I'm watching you" while pointing a finger in Mr. Ghose's face.

81.     Defendant Morales also started to call Plaintiff "you stupid Bengali" and to utter other racist statements towards him.

82.     Defendant Morales forced Plaintiff to ask permission to use the bathroom and humiliated him on several occasions by unreasonably denying permission, instead telling Mr. Ghose, "Just piss in the garbage can."

83.     Defendant Morales' harassment also involved interfering with Mr. Ghose's vacation schedule.

84.     For example, Plaintiff took two vacation days on April 20, 2018 (Friday) and April 23, 2018 (Monday) to attend a new Hindu Temple opening and inaugural deity installation in Michigan.

85.     Mr. Ghose had obtained approval from Defendants to take these two personal days about two weeks in advance of his trip.

86.     Despite this, while Mr. Ghose was in Michigan, Defendant Morales sent him a text message stating he had not gotten coverage for Mr. Ghose's shift on April 23, 2018, and that he was to report for work.

87.     Mr. Ghose was forced to cut his vacation short and buy a last-minute ticket back to New York City to report for work on 23rd April.

88.     Mr. Ghose was unable to see the completion of the inauguration of the Hindu temple.

## Plaintiff Encounters Ms. O'Hagan Wolfe in the Courthouse and This Triggers Further Reprisals and Harassment.

89.     Towards the end of June, 2018, Mr. Ghose was escorting two contractors in the 2nd Circuit Courthouse cafeteria located on the ground floor.

90.     While in the cafeteria, Mr. Ghose noticed Ms. O'Hagan Wolfe in the cafeteria looking directly at him with visible hostility and annoyance.

91.     Mr. Ghose had not seen Ms. O'Hagan Wolfe since the April 19, 2018 meeting as Mr. Ghose had done what Defendant Morales instructed him to do and avoided the 16, 17th and 18th Floors to avoid any interaction with her.

92.     Upon information and belief, this brief sighting of Plaintiff by Ms. O'Hagan Wolfe prompted further and more serious reprisals by Defendant Morales, including within days an unfair and baseless disciplinary write up.

93.     On July 10, 2018, at 1:57PM, just prior to the start of Plaintiff's shift at 2PM, a new Fire

Safety Director, Derek Bernard, sent Mr. Ghose an email informing him that at 1:09PM, the fire

alarm system had been placed in "waterflow test" mode.

94.     Defendant Morales had hired Mr. Bernard in May 2018 ostensibly to replace another Fire

Safety Director, David Anderson, who had left about two and half months prior.

95.     In his email, Mr. Bernard also informed Plaintiff that Pinter Anderson, a contractor with

the vendor Madison Fire Command, was conducting a tamper and waterflow testing.

96.     Madison Fire Command is a vendor contracted by GSA to perform this type of work,

including at the 2d Circuit Courthouse.

97.     Mr. Bernard's email to Plaintiff did not mention the duct detector or that Mr. Anderson

was in the process of testing it.

98.     Within minutes after the start of Mr. Ghose's shift, at 2:06 PM, the duct detector alarm

sounded without warning.

99.     Whenever any fire alarm devices are tested, especially during weekdays when the

courthouse was fully occupied, the Fire Safety Director on duty was required to announce this

throughout the building just prior to the testing.

100.    Mr. Bernard did not make any announcements prior to leaving on his shift, nor did he

warn Plaintiff that the alarm would sound.

101.    Upon the alarm sounding, Plaintiff turned off the duct detector alarm immediately.

102.    Plaintiff immediately contacted Mr. Anderson over his walkie talkie to ask him why the

duct detector alarm had gone off and why no one had announced it before or warned him.

103.     Mr. Anderson informed Plaintiff he had activated the duct detector by mistake as he was

testing it and that it was Mr. Anderson's fault.

104.    Whereupon Mr. Ghose immediately made two announcements throughout the 2d Circuit Courthouse informing every one of the false alarm and compiled a report, which he emailed to Defendant Morales who was off from work that day.

105.    Plaintiff also sent a copy of this email to Mr. Vaughan, Mr. Bernard, and Ms. Lawrence.

106.    Plaintiff did the foregoing in accordance with LB&B's fire safety procedures and with his training.

107.    Despite this, on July 13th, 2018, Defendant Morales issued Plaintiff with an unfair "final" write up, falsely accusing him of delaying in making the false alarm announcement.

108.    Defendant Morales knew this write up was completely baseless and unjust.

109.    Mr. Ghose protested the write up and told Defendant Morales that he had announced the alarm within two minutes of it sounding and had written him an email to this effect on July 10, 2018.

110.    Defendant Morales responded, "Yes, I saw the email."

111.    Mr. Vaughan, who was also present said, "I saw the email too."

112.    Notwithstanding, Defendant Morales coerced Mr. Ghose into signing the write-up to acknowledge receipt, telling him, "The write-up is not going anywhere, it is going to stay here. So don't call the corporate office."

113.    Defendant Morales then warned Mr. Ghose that if he called the corporate office about the write-up he would "fire" him.

114.    This was the first write-up issued to Plaintiff during his employment and hence it should have only been an oral/verbal warning per LB&B progressive disciplinary rules.

115.    Yet the July 13, 2018 write-up expressly stated, "[i]f this happens again your employment with LB & B will terminated [sic]."

## The Continuing Racist Harassment & Retaliation

116.   Meanwhile, Defendant Morales and others, including Mr. Bernard and Mr. Vaughn, continued to harass Mr. Ghose and state offensive racist things to him, such as frequently calling him a "stupid Bengali."

117.   They would also often shout "Repeat!" at Mr. Ghose when he would state something alluding to his accent.

118.   Mr. Vaughan also told Mr. Ghose that it was problematic for him to use his real name on his private Facebook profile as his page contained Hindu religious photos and pictures of Mr. Ghose and his śikhā.,

119.   On more than one occasion, Defendant Morales told Mr. Ghose that his śikhā and hairstyle were "not good for business."

120.   Finally, Defendants also often made offensive comments and jokes about how old Mr. Ghose was.

121.   On one occasion, Mr. Ghose removed his jacket briefly exposing his midriff.

122.   Upon seeing his exposed belly, Defendant Morales told Plaintiff, "You look like a pregnant lady" in front of several people all of whom laughed.

123.   Mr. Ghose felt very humiliated.

124.   On October 25th, 2018, Defendant Morales forced Mr. Ghose to conduct a monthly warden phone test with Mr. Morales, which required Plaintiff to report for work at 10AM, two hours prior to his shift.

125.   Mr. Morales refused to pay Plaintiff for these two hours, which were required to be paid at the overtime rate per Mr. Ghose's union contract.

126.    Meanwhile, that same day, Mr. Morales required Mr. Bernard to work overtime from 2PM-4PM and he compensated him for those two hours at the required overtime rate.

127.    Defendant Morales routinely paid Mr. Bernard and others at the required overtime rate while depriving Plaintiff any overtime pay and this was for retaliatory reasons.

128.    Just before the Federal government shutdown of 2018 ended, Defendant Morales told Plaintiff that if the shutdown were to continue for another week, "You are out of here for good!" and that he would "fire" him.

129.    Throughout the Federal government shutdowns, the Federal courts were closed.

130.    In early January, 2019, Mr. Bernard called Plaintiff and woke him up repeatedly throughout the night to tell him he was in the hospital with his son and to ask Mr. Ghose to cover his shift the following day.

131.    On each occasion that he called, Mr. Ghose assured Mr. Bernard he would cover his shift, but Mr. Bernard kept calling him.

132.    In February 2019, Defendant Morales forced Plaintiff to work a double shift for Mr. Bernard during an Active Shooter test and refused to pay him overtime.

133.    Defendant Morales would typically pay overtime to Mr. Ghose's co-workers in such circumstances without issue.

134.    In March 2019, Defendant Morales demanded that Mr. Ghose report for work at 8AM to supervise a construction escort from 8AM until 11AM.

135.    Because this was overtime work that was additional to Mr. Ghose's 2PM-10PM shift, Defendant Morales promised Mr. Ghose overtime to pay.

136.    On that basis, Mr. Ghose agreed to perform the work.

137.     At 11AM, after supervising the construction escort, Defendant Morales told Mr. Ghose to sign out of work immediately and leave the 2d Circuit Courthouse on a very cold day and not to report for work until 2PM.

138.     Defendant Morales did so to deny Mr. Ghose overtime despite promising to pay him.

139.     Defendant Morales would typically pay other employees overtime pay under similar circumstances.

140.     During the night of March 2, 2019, Mr. Bernard called Plaintiff during the night and woke him up on several occasions to tell him he had to get a babysitter and that his wife was starting a new job.

141.     The following day, Mr. Ghose complained to Defendant Morales about Mr. Bernard needlessly calling him throughout the night.

142.     Defendant Morales was dismissive about Mr. Ghose's concerns, and just shrugged his shoulders and said, "Just do your thing."

143.     On or about March 15, 2019, Mr. Bernard triggered the fire alarms to sound in the 2nd Circuit Courthouse for an extended period.

144.     Plaintiff overheard LB&B's Engineer, Keith Okin, ask Mr. Bernard if he had "disabled points," meaning disabled the fire safety devices from sounding alarms.

145.     Mr. Bernard replied that he had "forgotten" to do so.

146.     Because of Mr. Bernard's failure to disable the points, the alarms sounded for several minutes and could not be turned off.

147.     Disabling points is a key component of fire safety at the 2nd Circuit Courthouse.

148.    Defendant Morales was advised of Mr. Bernard's oversight but, in stark contrast to what would have happened to Mr. Ghose if he had committed the same infraction, Defendant Morales did not discipline Mr. Bernard, nor did he write him up.

## The Retaliation Culminates in Plaintiff's Dismissal

149.    On March 18, 2019, a visitor to the courthouse had accidentally entered the "PE2" staff elevator, which required an access card to exit once the elevator doors closed.

150.    Upon information and belief, this visitor alerted the person he was trying to visit that he was trapped in the elevator who in turn contacted building security.

151.    Plaintiff was informed of the trapped visitor after he overheard a conversation between the security guard, "Paul," and an engineer, "Harold K," over the walkie-talkie radios.

152.    After hearing of the trapped visitor, Mr. Ghose immediately communicated with the visitor through the intercom in the "PE2" elevator and asked the visitor if he had a building access card, to which the visitor replied that he did not.

153.    Mr. Ghose then instructed the visitor to push the letter "L" on the elevator panel to be taken back to the lobby and then to ask any security guard to escort him to his intended floor.

154.    From the time Mr. Ghose learned of the trapped visitor until he instructed him to go back to the lobby took no more than one minute.

155.    Visitors entering the building using staff elevators inadvertently was a frequent occurrence within the 2d Circuit Courthouse.

156.    Mr. Ghose acted in accordance with the required protocol and at no point did Defendant Morales ever advise Mr. Ghose he had done anything wrong.

157.    Yet without warning, four days later, on March 22, 2019, Defendant Morales pounced on this innocuous incident involving the visitor in the elevator to terminate Plaintiff's employment.

158.    Defendant Morales's written notice of termination, dated March 22, 2019, was also replete with falsehoods.

159.    For example, Defendant Morales falsely claimed in the termination notice there was "no radio response" from Mr. Ghose when they were alerted about the visitor's entrapment on March 19, 2019.

160.    In this written notice, Defendant Morales also falsely asserted that on March 4, 2019, during several warden checks Mr. Ghose had failed to provide him a radio response.

161.    In truth, on March 4, 2019, Defendant Morales called Plaintiff and had asked him if he had heard the wardens of each floor check in, to which Plaintiff responded that he had.

162.    At which point, Defendant Morales then arrived at the Fire Command Center and angrily asked Mr. Ghose to give him the warden radio checklist.

163.    Mr. Ghose did so, and Defendant Morales saw that Mr. Ghose had already checked in the names of the two wardens in question, that of Allison Cavale and Lourdes Aquino.

164.    Defendant Morales then left the Fire Command Center after learning that Plaintiff had not done anything wrong and this incident was not mentioned again until the termination notice.

165.    In the termination notice, Defendant Morales also falsely cited Plaintiff for his "[f]ailure to respond to alarm throughout the building on July 10th 2018 at 2:06 pm during your shift."

166.    As stated above, Plaintiff did in fact promptly respond to the alarm by making a false alarm announcement in accordance with his training and Defendants' procedures.

167.    Defendant Morales' termination notice also alleged "multiple complaints from various tenants" about Mr. Ghose's training.

168.    The only issues ever brought to Mr. Ghose's attention regarding his fire safety training were those raised by Ms. O'Hagan Wolfe about the SIP procedures, which was innocuous.

169.     As stated above, Mr. Ghose only covered those SIP procedures as they were in the training manual, and he did not cover them again after Defendant Morales instructed him not to do so.

170.     Defendant Morales also claimed he had accompanied Plaintiff to a training Mr. Ghose gave on April 11, 2018 to Hon. Judge Sullivan and his staff and that Mr. Ghose did not know what he was "doing or saying."

171.     This is false. Defendant Morales had entered the room on April 11, 2018 after Mr. Ghose's training session had ended.

172.     Whereupon Defendant Morales asked Judge Sullivan whether he and his staff were satisfied with Plaintiff's training presentation, to which Judge Sullivan replied, "Stanley was fine."

173.     After the training, Judge Sullivan mentioned to Mr. Ghose that the fire safety plan still indicated Chambers Room 2104 in the wrong location, which had been wrong since the last training session Mr. Ghose had done in October 2017.

174.     In or about October, 2017, Mr. Ghose had alerted the Fire Safety Coordinator and Defendant Morales to update the fire safety plan with the correct location for room 2104 but they failed to do so.

### Plaintiff Complains to LB&B's HR Manager That His Dismissal was Unlawful Discrimination and Retaliation

175.     Within an hour after Defendant Morales informed Plaintiff he was being discharged, Mr. Ghose called LB&B's Corporate Office and complained about the circumstances surrounding his discharge to Daniel Heser, LB&B's Human Resources Manager.

176.     Mr. Heser recorded this conversation.

177.     During this conversation, Mr. Ghose explained to Mr. Heser how he had been racially

harassed by Ms. O'Hagan Wolfe during the training seminar, citing among other things, her

offensive comments about his appearance and his śikhā.

178.     Mr. Ghose told Mr. Heser he reported this incident to Defendant Morales and Mr.

Vaughan and that since that time they began to treat him in a "harsh manner" and to "punish him

on the basis of falsehoods continuously until his termination."

179.     Mr. Ghose also addressed the false accusations outlined by Defendant Morales in his

notice of termination.

180.     For example, Plaintiff explained he had handled the situation with the visitor entrapped in

the elevator on March 18, 2019 according to security protocols.

181.     Mr. Ghose told Mr. Heser that the July 13, 2018 write-up – in which Defendant Morales

falsely accused Plaintiff of delaying in making a false alarm announcement – was demonstrably

false as could be readily proven by pulling up the time records.

182.     Within 45 mins of this conversation, Mr. Heser called Mr. Ghose back and said he did

not find evidence of discrimination and that the decision to discharge him "would stand."

183.     Notably, prior to making this determination, Mr. Heser did not seek any documents or

evidence proving the falsity of Defendant Morales' claims.

184.     Upon information and belief, Mr. Heser merely called Defendant Morales and relied

exclusively on his verbal account regarding Plaintiff's work performance.

185.     Yet, Defendants' policies required Mr. Heser and/or others in LB&B's HR Department to

conduct an adequate thorough investigation, that at the very least, should have involved

reviewing records to verify Defendant Morales' claimed bases for dismissing Mr. Ghose.

186.     Defendants cancelled Mr. Ghose's health insurance coverage soon after his discharge.

187.    Given the foregoing, Defendants discriminated against Mr. Ghose based on his race, national origin, and religion.

188.    Defendants committed, were aware of, authorized and condoned the discriminatory and unlawful behavior stated herein.

189.    The actions stated herein were discriminatory and unlawful in that they were motivated because of Plaintiff's race and religion and in retaliation for the sum of Plaintiff's protected activity.

190.    The actions complained of herein were committed willingly, with reckless disregard to Plaintiff's rights and constitute a continuing policy and practice of discrimination.

191.    Ms. O'Hagan Wolfe discriminated against Plaintiff based on his race and religion and procured his unlawful discharge.

192.    Defendant Morales personally directed the discriminatory conduct and personally made the decision to terminate Plaintiff's employment.

193.    Defendant Morales also aided and abetted Ms. O'Hagan Wolfe's discriminatory and retaliatory action against Plaintiff, and both, acting in concert procured Plaintiff's unlawful dismissal.

## FIRST CAUSE OF ACTION:

## SECTION 1981 (RACE DISCRIMINATION AND RETALIATION)

194.    The allegations in the preceding paragraphs are repeated here as if fully stated.

195.    Defendants intentionally retaliated against and discriminated against Plaintiff based on his race and color in violation of Section 1981.

196.    Plaintiff has thereby been damaged in an amount yet undetermined, but exceeding $1,000,000.

**SECOND CAUSE OF ACTION:**

**RACE DISCRIMINATON AND RETALIATION (SHRL)**

197.    The allegations in the preceding paragraphs are repeated here as if fully stated.

198.    Defendants intentionally racially discriminated against Plaintiff and created a racially

hostile work environment in violation of the SHRL.

199.    In violation of the SHRL, Defendants intentionally retaliated against Plaintiff because of

the sum of Plaintiff's protected activity, including Plaintiff's complaints about Ms. O'Hagan

Wolfe's racial harassment.

200.    Defendants' actions were a malicious, willful, and reckless violation of Plaintiff's rights.

201.    Plaintiff has thereby been damaged in an amount yet undetermined but exceeding

$1,000,000.

**THIRD CAUSE OF ACTION:**

**RACE DISCRIMINATION AND RETALIATION (CHRL)**

202.    The allegations in the preceding paragraphs are repeated here as if fully stated.

203.    Defendants intentionally racially discriminated against Plaintiff and created a racially

hostile work environment in violation of the CHRL.

204.    In violation of the CHRL, Defendants intentionally retaliated against Plaintiff because of

the sum of Plaintiff's protected activity, namely complaining about Ms. O'Hagan Wolfe's racial

harassment.

205.    The Individual Defendant aided and abetted Ms. O'Hagan's discrimination, harassment

and retaliation and condoned Ms. O'Hagan Wolfe's unlawful conduct.

206.    Defendants' actions were malicious, willful, and reckless violation of Plaintiff's rights.

207.    Plaintiff has thereby been damaged in an amount yet undetermined but exceeding $1,000,000.

## FOURTH CAUSE OF ACTION:

## RELIGIOUS DISCRIMINATON AND RETALIATION (SHRL)

208.    The allegations in the preceding paragraphs are repeated here as if fully stated.

209.    Defendants intentionally discriminated against Plaintiff and created a racially hostile work environment in violation of the SHRL based on his religion.

210.    In violation of the SHRL, Defendants intentionally retaliated against Plaintiff because of the sum of Plaintiff's protected activity, including Plaintiff's complaints of Ms. O'Hagan Wolfe's religious harassment, namely her remarks regarding Plaintiff's appearance and religious śikhā.

211.    Defendants' actions were a malicious, willful, and reckless violation of Plaintiff's rights.

212.    Plaintiff has thereby been damaged in an amount yet undetermined but exceeding $1,000,000.

## FIFTH CAUSE OF ACTION:

## RELIGIOUS DISCRIMINATION AND RETALIATION (CHRL)

213.    The allegations in the preceding paragraphs are repeated here as if fully stated.

214.    Defendants intentionally discriminated against Plaintiff and created a hostile work environment in violation of the CHRL based on Plaintiff's religion.

215.    In violation of the CHRL, Defendants intentionally retaliated against Plaintiff because of the sum of Plaintiff's protected activity, namely complaining about Ms. O'Hagan Wolfe's religious harassment.

216.    The Individual Defendant aided and abetted Ms. O'Hagan's discrimination, harassment and retaliation and condoned Ms. O'Hagan Wolfe's unlawful conduct.

217.    Defendants' actions were malicious, willful, and reckless violation of Plaintiff's rights.

218.    Plaintiff has thereby been damaged in an amount yet undetermined but exceeding $1,000,000.

**WHEREFORE,** Plaintiff respectfully requests that this Court enter a judgment:

(a)    Declaring the acts and practices complained of herein to be violations of the the Section 1981, SHRL and the CHRL.

(b)    Enjoining and permanently restraining these violations of the Section 1981m the SHRL and the CHRL.

(c)    Directing Defendants to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect Plaintiff's employment opportunities, including restoring positions, offices and terms and conditions previously deprived him.

(d)    Directing Defendants to make Plaintiff whole for all losses he has incurred because of Defendants' discriminatory and retaliatory acts.

(e)    Directing Defendants to pay Plaintiff compensatory damages, including damages for reputational harm, emotional distress, humiliation, and resulting physical injury.

(f)    Directing the Defendants to pay Plaintiff punitive damages under the CHRL.

(h)    Awarding Plaintiff, the costs of this action, together with reasonable attorneys' fees, as provided by Section 1981, SHRL and the CHRL; and

(f)    Granting such other and further relief as this Court deems necessary and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a

trial by jury in this action.

Dated:          November 2, 2022
                 New York, New York

                                        **LAW OFFICES OF IAN WALLACE, PLLC**

                             By:    _____
                                        Ian F. Wallace (IW: 3100)
                                        *Attorney for Plaintiff*
                                        501 Fifth Avenue – 19th Floor
                                        New York, N.Y. 10017
                                        (212) 661-5306